Filed 2/27/14  P. v. DeConter CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM GREGORY DeCONTER, JR.,<br><br>    Defendant and Appellant. | A135352<br><br>(Sonoma County<br>Super. Ct. No. SCR600403) |

### INTRODUCTION

Defendant and appellant William Gregory DeConter, Jr., was convicted of driving under the influence of alcohol and driving with a blood alcohol content exceeding 0.08 percent.  He contends:  no substantial evidence supported the verdict because the prosecution did not prove the corpus delicti; the court denied his due process rights by instructing the jury on permissive inferences; and the calculation of presentence conduct credit under Penal Code section 4019 violated his equal protection rights.  We conclude these claims are meritless, and affirm the judgment.

### BACKGROUND

Defendant lived in the same apartment complex as his ex-girlfriend, L.K.  On March 28, 2011, L.K. was standing outside with Thomas Pepper, whom she was dating at the time.  Between 8:00 and 8:30 p.m., Pepper saw defendant's vehicle leave the apartment complex and saw defendant drive back into the complex about five minutes later.

1

Within "three [or] four minutes" of defendant driving by, Pepper "gave [L.K.] a kiss goodnight" and went around the corner to where he had parked his truck. He discovered the "right passenger window [of his truck] was shattered, broken," and he could "still hear it crackling." Pepper went back to L.K.'s apartment, and the two of them returned to Pepper's truck, where he called 911. Pepper immediately suspected defendant, who "didn't seem to apparently like [him] dating . . . his ex-girlfriend."

At about 8:25 p.m., Santa Rosa Police Officer Christopher Mahurin was dispatched to a parking lot next to defendant's apartment complex regarding the possible vandalism of Pepper's truck. Pepper testified it took about 10 minutes for the officer to arrive from the time he called 911. Officer Mahurin met with Pepper and L.K., then went to defendant's apartment and made contact with him at about 8:34 p.m. Officer Mahurin observed defendant had "watery, glassy eyes, slow and slurred speech, as well as a strong odor of alcoholic beverage . . . ." Defendant was having difficulty standing without leaning on the door frame and was "swaying back and forth." When he moved away from the door frame, "[h]e was stumbling as he was walking, having a difficult time." It appeared to Officer Mahurin defendant was intoxicated.

Officer Mahurin asked defendant if he had broken Pepper's truck window, and he responded "he hadn't because he had just pulled in two minutes ago." Defendant told the officer he had gone to a liquor store to buy alcohol. When asked whether he was drunk, he responded, "Oh, yeah." Defendant also told him he "hadn't had anything to drink since he had gotten home from the liquor store." Officer Mahurin initiated five field sobriety tests, none of which defendant passed. The tests took about 15 minutes to complete, after which Officer Mahurin arrested defendant.

Officer Mahurin verified that the vehicle identified as the one defendant had been driving was registered to him. He touched the hood of the vehicle and determined "it was still warm and looked like it had been recently driven." Based on the hood temperature and his experience, Officer Mahurin testified the vehicle had been operated "definitely within a half hour by the warmth of it."

2

Officer Mahurin told defendant he had a choice between taking a breath or blood test, and he chose a blood test. Officer Mahurin transported him to Sutter Hospital. The drive to the hospital took seven or eight minutes, and Officer Mahurin could smell alcohol on defendant during the trip. A registered nurse drew defendant's blood sample at about 9:45 p.m. The blood alcohol content (BAC) of the blood sample was 0.21 percent.

The Sonoma County District Attorney charged defendant by information with driving under the influence of alcohol (Veh. Code,[1] § 23152, subd. (a)) and driving with a BAC of 0.08 percent or above. (§ 23152, subd. (b).)[2] As to both counts, there were enhancing allegations that defendant's BAC was 0.20 percent or more (§ 23538, subd. (b)(2)) and he had three or more prior convictions for driving under the influence in the last 10 years. (§ 23550.)

At trial, the criminalist testified there is a five percent error rate in the alcohol testing process, which meant defendant's BAC could have been 0.20 or 0.22 percent. The criminalist explained an average 1.25 ounce shot of 80 proof alcohol would raise the BAC of a 150-pound man by 0.025 percent. It would take approximately eight shots of alcohol to raise the BAC of a 150-pound man to 0.21 percent. The criminalist could not determine from the results of the blood test, alone, whether defendant's BAC was going up or down.

Following the close of the prosecution's case at trial, defendant moved for a directed verdict on all counts and the section 23538, subdivision (b)(2) enhancements. The court granted the motion as to the enhancements for driving with a BAC of 0.20 percent or more, but denied it as to the remaining counts. The jury found defendant

---

[1]All further statutory references are to the Vehicle Code unless otherwise indicated.

[2]Violation of subdivision (a) of section 23152 is sometimes called a "generic DUI," while violation of subdivision (b) is known as a "per se DUI." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1193.)

3

guilty of both counts, and the court found true the remaining enhancing allegation of three prior convictions of driving under the influence.

The court sentenced defendant to the aggravated term of three years in state prison, and revoked his driver's license for four years. The court awarded him a custody credit of 135 days: 91 actual days and 44 days of local conduct credit.

DISCUSSION

*The Corpus Delicti*

Defendant maintains the prosecution failed to establish the corpus delicti of the crimes of which he was convicted. He asserts "no one observed [him] intoxicated until a half an hour after he drove his truck," and the only evidence that would permit the inference he was intoxicated while driving was his "uncorroborated statement that he did not drink alcohol upon returning from the liquor store."

" 'In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. . . . [T]he prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. [Citations.] Though mandated by no statute, and never deemed a constitutional guaranty, the rule requiring some independent proof of the corpus delicti has roots in the common law.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 825, citing *People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169.) The purpose of the corpus delicti rule is to ensure that "the accused is not admitting to a crime that never occurred." (*People v. Jennings* (1991) 53 Cal.3d 334, 368.)

Proof of the corpus delicti "may be circumstantial and need only be a slight or prima facie showing 'permitting the reasonable inference that a crime was committed.' [Citations.]" (*People v. Jennings*, *supra*, 53 Cal.3d at p. 364.) "Such independent proof may consist of circumstantial evidence [citations], and need not establish the crime beyond a reasonable doubt. [Citations.]" [¶] . . ."The amount of independent proof of a crime required for this purpose is quite small; we have described this quantum of evidence as 'slight' [citation] or 'minimal' [citation]. The People need make only a

4

prima facie showing ' " 'permitting the reasonable inference that a crime was committed.' " ' [Citations.] The inference need not be 'the only, or even the most compelling, one . . . [but need only be] a *reasonable* one . . . .' [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 301–302, original italics, superseded by statute on other grounds as noted in *People v. Johnson* (2013) 222 Cal. App.4th 486, 497.)

The evidence established Pepper saw defendant's vehicle leave sometime between 8:00 and 8:30 p.m., and observed defendant return about five minutes later. Officer Mahurin observed defendant's highly inebriated condition at approximately 8:34 p.m. He thereafter confirmed the hood of defendant's vehicle was still warm and the vehicle looked as though it had just been driven. This evidence amply established the corpus delicti and permitted a reasonable inference that defendant had driven while under the influence of alcohol.

Defendant maintains the trial court's grant of a directed verdict as to the enhancing allegation that he drove with a BAC of 0.20 or higher demonstrates "there was no evidence which permitted the expert to determine DeConter's blood alcohol level for *any time prior to the arrival of Officer Mahurin . . . .*" (Italics added.) In dismissing the enhancing allegation, the court stated, "[t]here was just nothing that the expert said that could have, in my opinion, have the jury believe that it was 0.20 or over at the time of the driving." The soundness of the trial court's opinion as to the 0.20 enhancement is, of course, not before us. Rather, the issue is whether there was sufficient evidence of the corpus delicti of the two charged crimes, driving under the influence and driving with a BAC over 0.08 percent, as to which the trial court denied defendant's motion for a directed verdict.

Defendant claims he "could have been sober at the time that he was observed driving, then consumed alcohol upon returning home from the liquor store," and exhibited signs of inebriation "approximately one half hour later." Even assuming this proffered conclusion is a reasonable one, and we are not suggesting it is, the evidence permitted another reasonable conclusion—that defendant had driven under the influence and with a BAC exceeding 0.08 percent. As we have recounted, the time between Pepper

5

witnessing defendant driving and Officer Mahurin observing defendant's highly intoxicated state was, at most, 29 minutes.  The criminalist, in turn, testified it would take about eight shots to raise a 150-pound man's blood alcohol level to 0.21 percent.  Together, this evidence met the prosecution's burden of making a "slight or prima facie showing" permitting a "reasonable inference" the crimes of driving under the influence and with a BAC exceeding 0.08 percent were committed.  (See *People v. Jones*, *supra*, 17 Cal.4th at pp. 301–303; *People v. McNorton* (2001) 91 Cal.App.4th Supp. 1, 6 [corpus delicti rule does not require the prosecutor to "eliminate all other reasonable inferences"].)**[3]**

### Substantial Evidence

Defendant further contends that, even if the prosecution proved the corpus delicti, there was "insufficient evidence to establish that [he] drove while under the influence of alcohol . . . ."  He claims the "prosecution failed to present any evidence, circumstantial or otherwise, that permits the inference that [he] drove a vehicle while intoxicated."

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." '  (*People v. Bolden* (2002) 29 Cal.4th 515, 553.)  " 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the

---

**[3]**Defendant did not raise the corpus delicti issue in the trial court, but maintains he may assert it here because the failure to do so constituted ineffective assistance of counsel.  Because we conclude the prosecution met its burden of proving the corpus delicti, the failure to object on that basis did not constitute ineffective assistance of counsel.

circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' The conviction shall stand ' "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " ' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507–508.)

The evidence showed defendant was driving between 8:00 and 8:30 p.m. on the night of the incident. At 8:34 p.m., Officer Mahurin observed he had "watery, glassy eyes, slow and slurred speech, as well as a strong odor of alcoholic beverage." Defendant told Officer Mahurin he had "just pulled in two minutes ago" after going to a liquor store to buy alcohol.[4] The hood of his vehicle was still warm. Defendant admitted he was drunk and "hadn't had anything to drink since he had gotten home from the liquor store." He failed five field sobriety tests. At 9:45 p.m., his BAC was 0.21 percent. Substantial evidence supports the jury's verdict.

### *Jury Instructions*

Defendant additionally contends the trial court erred in instructing the jury with CALCRIM Nos. 2110 and 2111, which he claims violated his due process rights by reducing the prosecution's burden of proof. We review "jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt." (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)

The court instructed the jury as follows: "If the People have proved beyond a reasonable doubt that the defendant's blood alcohol level was 0.08 percent or more at the time of the chemical analysis, *you may, but are not required*, to conclude that the

---

[4]Defendant appears to conflate the corpus delicti rule with the substantial evidence standard of review. We concluded in the previous section the prosecution had proved the corpus delicti without considering evidence of defendant's statements to Officer Mahurin. In contrast, in considering whether substantial evidence supports the verdict, we review "the entire record," including evidence of defendant's statements to Officer Mahurin. (See *People v. Bolden*, *supra*, 29 Cal.4th at p. 553.)

7

defendant was under the influence of an alcoholic beverage at the time of the alleged offense. . . . [¶] If the People have proved beyond a reasonable doubt that a sample of defendant's [blood] was taken within three hours of the defendant's alleged driving, and a chemical analysis of the sample showed a blood alcohol level of 0.08 percent or more, *you may but are not required* to conclude that the defendant's blood alcohol level was 0.08 percent or more at the time of the alleged offense." (Italics added.)

The instructions given are based on sections 23152 and 23610. Section 23152 provides in part: "In any prosecution under this subdivision, it is a rebuttable presumption that the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after the driving." (§ 23152, subd. (b).) Section 23610 provides in part: "[T]he amount of alcohol in the person's blood at the time of the test as shown by chemical analysis of that person's blood, breath, or urine shall give rise to the following presumptions affecting the burden of proof: [¶] . . . [¶] . . . If there was at that time 0.08 percent or more, by weight, of alcohol in the person's blood, it shall be presumed that the person was under the influence of an alcoholic beverage at the time of the alleged offense." (§ 23610, subd. (a)(3).)

Defendant maintains the "presumptive inference instruction impermissibly reduced the prosecution's burden of proof. . . ."

However, "[a]s the United States Supreme Court has explained, 'The most common evidentiary device is the entirely permissive inference or presumption, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one . . . .' " (*People v. Beltran* (2007) 157 Cal.App.4th 235, 240, fn. 4, citing *Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.) " ' " 'Permissive presumptions' are not really presumptions at all. Instead, they are simply inferences drawn from evidence. They do not shift the prosecution's burden of production, and the jury is not required to abide by them. An instruction about a 'permissive presumption' is really an instructed inference." '[Citation.]" (*People v.*

8

*Beltran*, *supra*, 157 Cal.App.4th at p. 242) Because a permissive presumption " 'leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference.' " (*People v. Roder* (1983) 33 Cal.3d 491, 498, citing *Ulster County Court v. Allen, supra*, 442 U.S. 140, 157.)

"[T]he test to be applied in any situation wherein a presumption may be relied upon in a criminal case is whether there is a rational connection between the fact proved and the fact presumed. . . .[¶] . . . Probably, no fact is more firmly established medically than that the ingestion of alcohol in any substantial quantity impairs one's ability to drive a vehicle. The dismal statistic that alcohol is involved in an inordinate percentage of the accidents resulting in death, dispels any claim that there is no rational connection between the consumption of alcohol by a driver and his driving record." (*People v. Schrieber* (1975) 45 Cal.App.3d 917, 920.) "The presumption . . . is not based on speculation but is founded on the long-recognized and scientifically established relationship between blood alcohol level and degree of intoxication. . . . There thus exists sufficient rational connection in experience between the preliminary fact proved and the ultimate fact presumed to satisfy the requirement of due process of law." (*People v. Lachman* (1972) 23 Cal.App.3d 1094, 1098.)

Relying on *People v. Beltran*, *supra*, 157 Cal.App.4th 235, defendant nevertheless contends the permissive inference instruction in this case "was not rationally connected to an element of the offense." In *Beltran*, the defendant was charged with both generic and per se driving under the influence. (*Id*. at p. 239.) Two roadside breath tests taken about half an hour after police stopped him for speeding indicated the defendant's BAC at that time was 0.08 percent. (*Id*. at p. 238.) An intoxilyzer breath test administered about half an hour after the roadside breath test indicated a BAC, then, of 0.10 percent. (*Id.* at p. 239.) There was testimony at trial, by both the defense and the prosecution expert witnesses, that the defendant's BAC at the time of driving was less than 0.08 percent and the breath tests showed the defendant's BAC was "rising" from the time he was stopped

until the intoxilyzer tests were administered. (*Id*. at pp. 239, 246.) The court explained "while in isolation either the [roadside breath] tests or the intoxilyzer tests were sufficient to allow for the inference permitted by [the jury instruction], *together* they show that [defendant's] BAC was *rising* from the time he was stopped until the intoxilyzer tests were administered." (*Id*. at p. 246.) Thus, the court held giving the permissive inference instruction was "constitutional error that improperly lowered the prosecution's burden of proof" because "[t]aken as a whole, the connection between the proved fact (test result demonstrating a BAC of 0.08 percent or greater within three hours of driving) and the inferred fact (BAC of 0.08 percent or greater at the time of driving) . . . was not established . . . ." (*Id*. at p. 247.)

*Beltran* differs significantly from the case at hand. In that case, experts for both sides testified it could well have been "that appellant's BAC was below the legal limit at the time he was driving." (*Beltran, supra*, 157 Cal.App.4th at p. 239.) This was so because the defendant was subjected to two separate and distinct types of breath tests, the first a roadside "preliminary alcohol screening" (PAS) test and the second, taken less than a half-hour later, an intoxilyzer test. The PAS test indicated a BAC of 0.08 and the intoxilyzer showed a significantly increased level of 0.10 percent. (*Id*. at pp. 238–239.) Thus, there was strong evidence the defendant's BAC was rising at the time he was stopped and, thus, even per the prosecution's expert "assuming the reliability of the earlier PAS test results, appellant's BAC was around 0.068 percent when he was stopped." (*Id*. at p. 239.) This necessarily meant, as Presiding Justice Ruvolo wrote: "Taken as a whole, the connection between the proved fact (test result demonstrating a BAC of 0.08 percent or greater within three hours of driving) and the inferred fact (BAC of 0.08 percent or greater at the time of driving), which is an element of the charged crime, was not established beyond a reasonable doubt." (*Id*. at p. 247.) In this case, in contrast, there was only one blood alcohol content test result, and there was no evidence suggesting defendant's BAC was either rising or falling at the time of the test. Accordingly, the *Beltran* court's observation that "in isolation either the [roadside breath] tests or the intoxilyzer tests were sufficient to allow for the inference" is apposite and

10

there is a rational connection between the preliminary fact proved and the ultimate fact which the jury could infer. (*Id.* at p. 246.) Accordingly, defendant's due process rights were not violated by the instructions.

### *Custody Credits Under Penal Code Section 4019*

Defendant asserts he was denied equal protection because the court awarded him presentence custody credits under the amended version of Penal Code section 4019 applicable to crimes committed prior to October 1, 2011.[5] He concedes "[t]he facts underlying [his] conviction took place on March 28, 2011" but maintains there is no compelling state interest or rational basis for awarding different amounts of custody credits to inmates "depending on the date of the offense."

"A criminal defendant is entitled to accrue both actual presentence custody credits under Penal Code section 2900.5 and conduct credits under Penal Code section 4019 for the period of incarceration prior to sentencing." (*People v. Kennedy* (2012) 209 Cal.App.4th 385, 395 (*Kennedy*).) Section 4019 has been the subject of multiple amendments in recent years. "Before January 25, 2010, conduct credits under Penal Code section 4019 could be accrued at the rate of two days for every four days of actual time served in presentence custody. (Stats. 1982, ch. 1234, § 7, p. 4554 [former § 4019, subd. (f)].) Effective January 25, 2010, the Legislature amended Penal Code section 4019 in an extraordinary session to address the state's ongoing fiscal crisis. Among other things, Senate Bill No. 3X 18 . . . amended section 4019 such that defendants could accrue custody credits at the rate of two days for every two days actually served, twice the rate as before except for those defendants required to register as sex offenders, those committed for serious felonies (as defined in § 1192.7), or those who had prior convictions for violent or serious felonies. (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 28, §§ 50, 62 [Pen. Code former § 4019, subds. (b), (c) & (f)].)" (*Kennedy, supra,* 209 Cal.App.4th at p. 395.)

---

[5]Defendant was remanded into custody on February 3, 2012, and sentenced on May 3, 2012.

11

"Effective September 28, 2010, Penal Code section 4019 was amended again to restore the presentence conduct credit calculation that had been in effect prior to the January 2010 amendments, eliminating one-for-one credits (hereafter the September 2010 amendment; Stats. 2010, ch. 426, § 2). By its express terms, the newly created Penal Code section 4019, subdivision (g), declared these September 2010 amendments applicable only to inmates confined for crimes committed on or after that date, expressing legislative intention that they have prospective application only. (Stats. 2010, ch. 426, § 2.)" [¶] "Thereafter, again, the Legislature amended Penal Code section 4019. These statutory changes, among other things, reinstituted one-for-one conduct credits and made this change applicable to crimes committed on or after October 1, 2011, the operative date of the amendments, expressing legislative intent for prospective application only. (Pen. Code, § 4019, subds. (b), (c) & (h).)" (*Kennedy, supra,* 209 Cal.App.4th at pp. 395–396.)

Defendant acknowledges the statute is, by its terms, prospective only in application, but maintains "the distinction in credit-earning rights" based solely on the date of the offense violates equal protection principles. " 'Guarantees of equal protection embodied in the Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution prohibit the state from arbitrarily discriminating among persons subject to its jurisdiction. . . .' [Citation.]" (*People v. Chavez* (2004) 116 Cal.App.4th 1, 4.) "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, ' "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." ' [Citation.] 'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' [Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 328 (*Brown*).) "The 'similarly situated' prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with

12

respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.) "The analysis will not proceed beyond this stage if the groups at issue are not ' "similarly situated with respect to the legitimate purpose of the law," ' or if they are similarly situated, but receive ' "like treatment." ' Identical treatment is not required." (*In re Jose Z.* (2004) 116 Cal.App.4th 953, 960.)

Courts have disagreed about whether the groups at issue are similarly situated. In *Kennedy,* the defendant was also in presentence custody after October 1, 2011 for a crime committed before that date. (*Kennedy*, *supra*, 209 Cal.App.4th at pp. 396–397.) The court held the disparately-treated groups of defendants were not similarly situated. (*Ibid.*) Nevertheless, it concluded "[e]ven if this court were to agree that during the period of time that appellant was in presentence custody after October 1, 2011, he was similarly situated to other defendants who committed their crimes after October 1, and were in presentence custody, where, as here, the statutory distinction at issue neither 'touch[es] upon fundamental interests' nor is based on gender, there is no equal protection violation 'if the challenged classification bears a rational relationship to a legitimate state purpose. [Citations.]' . . . ' " ' " . . . Where there are 'plausible reasons' for [the classification], 'our inquiry is at an end.' " ' " ' [Citation.]" (*Id*. at p. 397.)

The court in *Kennedy* concluded there is "such a plausible reason in this case as to the period of time appellant was in custody after October 1, 2011." (*Kennedy*, *supra*, 209 Cal.App.4th at p. 397.) It explained "the Legislature could rationally have believed that by making the 2011 amendment to section 4019 have application determined by the date of the offense, they were preserving the deterrent effect of the criminal law as to those crimes committed before that date. To reward appellant with the enhanced credits of the 2011 amendment to section 4019, even for time he spent in custody after October 1, 2011, weakens the deterrent effect of the law as it stood when appellant committed his crimes. We see nothing irrational or implausible in a legislative conclusion that individuals should be punished in accordance with the sanctions and given the rewards (conduct credits) in effect at the time an offense was committed. [¶] Finally, . . . over the

13

past few years we have seen a series of incremental changes in conduct credit earning rates. . . .  Overall, the Legislature has tried to strike a delicate balance between reducing the prison population during the state's fiscal emergency and protecting public safety. Although such an effort may have resulted in comparable groups obtaining different credit earning results, under the rational relationship test, the Legislature is permitted to engage in piecemeal approaches to statutory schemes addressing social ills and funding services to see what works and what does not."  (*Kennedy*, *supra*, 209 Cal.App.4th at p. 399, fn. omitted.)

In contrast, the court in *People v. Rajanayagam* (2012) 211 Cal.App.4th 42 (*Rajanayagam*), held the two affected groups *were* similarly situated.  (*Id*. at p. 53.)  The court explained, "the two affected classes are . . . (1) those defendants who are in jail on and/or after October 1, 2011, who committed an offense on or after October 1, 2011; and (2) those defendants who are in jail on and/or after October 1, 2011, who committed the same offense *before* October 1, 2011."  (*Ibid.*)  [¶] . . . "These two groups committed the same offenses and are serving time together in local presentence custody but the current version of section 4019 treats them differently by awarding them different conduct credits based entirely on the dates they committed their offenses.  Nothing distinguishes the efforts of a prisoner who committed a crime after October 1, 2011, to earn conduct credits from the efforts of one who committed the same crime before that date.  Both classifications of prisoners, pre- and post-October 1, 2011, offense defendants, are aware of the conduct credit provision and have an incentive to perform assigned work and comply with rules and regulations because both classifications have the opportunity to earn conduct credit, just at different rates.  To argue that a defendant who committed an offense before October 1, 2011, but was in local custody on or after that date was not aware of the conduct credit provision and did not have an incentive to work and behave is unpersuasive.  Both classes have an incentive to work and behave but a defendant who committed a crime before the effective date is rewarded less.  Thus, based on the facts before us, the current version of section 4019 creates a classification that affects two similarly situated groups in an unequal manner."  (*Id*. at pp. 53–54.)

14

*Rajanayagam* concluded there was no equal protection violation, however, because "the classification in question does bear a rational relationship to cost savings . . . . [T]he California Supreme Court has stated equal protection of the laws does not forbid statutes and statutory amendments to have a beginning and to discriminate between rights of an earlier and later time. [Citation.] . . . [¶] . . . More importantly, in choosing October 1, 2011, as the effective date of Assembly Bill No. 109, the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. (Citation.) . . . Under the very deferential rational relationship test, we will not second-guess the Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced conduct credit to only those defendants who committed their offenses on or after October 1, 2011."[6] (*Rajanayagam*, *supra*, 211 Cal.App.4th at pp. 55–56.)

Assuming arguendo the two groups of defendants are similarly situated for purposes of the statute, we agree with *Kennedy* and *Rajanayagam* there is a rational basis for the differing treatment of the two groups. Accordingly, the application of section 4019 to defendant does not violate principles of equal protection.

---

[6]Although defendant maintains the classification affects a fundamental liberty interest requiring application of the compelling state interest test, both *Kennedy* and *Rajanayagam* held the rational basis test applied to the section 4019 classification. (*Kennedy*, *supra*, 209 Cal.App.4th at p. 397; *Rajanayagam*, *supra*, 211 Cal.App.4th at p. 54.)

**DISPOSITION**

The judgment is affirmed.

                               _____

                               Banke, J.

We concur:

_____

Margulies, Acting P. J.


_____

Dondero, J.